We will go on to the three consolidated cases, United States v. Holguin, where we're going to have three attorneys arguing for three different defendants. Thank you. Ms. Ivins and Mr. Formani, you can turn on your video, please. Ms. Ivins? Thank you. All right. So we will go in the order that we have here. Now, I am not at all a fan of a divided argument. Here you have different defendants and somewhat different arguments. So I suppose that's what we're doing, but it would be helpful if you tell us at the beginning what issues you're going to be addressing and understand that we don't need to stick to those issues and ask any questions. Thank you. Ms. Ivins? Good morning, Your Honor. Gail Ivins, appearing for Appellant Enrique Holguin. Mr. Kalanides will be going first and addressing the first question on the list that the court very thoughtfully provided. Mr. Formani will be going second, and I will be going third. Okay. Good morning, Your Honor. David Kalanides for Donald Goulet. I was trial counsel below. As Ms. Ivins stated, Your Honor, I will be addressing the court's question on the issue of the gatekeeping function and the failure of the district court to actually fulfill that function. Your Honor, it's fundamental that the district court's responsibility when it comes to evidence is to make sure that inadmissible evidence doesn't go before the jury. That is part of its gatekeeping function in general. When we're talking about 702 opinion testimony, it becomes particularly important that the district court ensure that that 702 opinion testimony meets the requirements for what is essentially an exception to the prohibition against opinion testimony. 702 opinion testimony is special. It makes specific witnesses designated as different from other witnesses. The government's case relied heavily on three witnesses who were permitted to testify under 702. Rene Enriquez, Robert Rodriguez, and Steve Paris. These three, the defense objected vehemently, litigated motions before the district court, objected to their testimony during the testimony, as well as in the case of Enriquez, renewed a motion to strike his testimony afterwards. The problem with each of these witnesses is that there was no reliability determination by the district court before that evidence was permitted to come in front of the jury. In Enriquez's case, he testified about his extensive involvement with the Mexican Mafia. We had objected that the issue did not relate to the Mexican Mafia because this is a case about the Contreras organization, not the Mexican Mafia. However, he was permitted to testify about his involvement, the crimes he committed on behalf of that gang, as well as his political maneuverings within the gang to develop his own reputation. But all of that testimony was about his participation nearly 20 years ago. At the time of trial, it was closer to 16 years. So what we have is we have 702 opinion testimony that is completely outdated. And the district court— Well, he also said that he apparently had been working with the police for many years, and in the meanwhile, he had—and he had reviewed all kinds of wiretaps and so on and so on. So he did have some explanation, which I gather was at the beginning of the evidence, for what he had been doing since 20 years ago. That's correct. I'm sorry, Your Honor. Go ahead. No, that is correct. That is what he testified that he said he kept up with what was going on in the gang. However, that's the question. Was that the type of method, procedure that 702 requires to establish reliability? Here we have somebody who is given information because he also testified that the information he had was not something that he requested. He never went on his own to determine, what has changed in the gang? How do I know that these phrases now mean something different than when I was there? He relied entirely on what the government provided to him. They said, listen to this. They said, look at this. And each time he came back with, as he testified, sort of this general feeling based on his experience. So is your submission a procedural or a substantive one? Is it that the district court should have done something else, and what should it have done? Or is it that, substantively, he was not reliable? It's both, Your Honor. But first, the most important question is the procedural one, because the gatekeeping function requires that the district court make the reliability finding before any of this evidence under 702 goes before the jury. And the district court didn't do that here. So even assuming that the district court erred in failing to explicitly make a reliability finding, you'd still have to show that the error was harmful. Harmlessness review still applies. Yes, Your Honor. It seems to me that in the areas that the expert and the leakers testified, these are pretty common areas of testimony in these sort of massive legal type of cases, isn't it? That is true, that this is the type of evidence, both when you have a former gang member, a dropout who cooperates, that is common. But in that specific case, you are more likely going to see somebody who recently was in the gang, not somebody like Enriquez, who has had no direct contact, no involvement, and could not even articulate what his method was to determine how the gang operated today. And then we have the law enforcement officers, and that is also very common. But the question isn't, is this type of 702 opinion testimony permissible generally? It's, are these specific individuals who the government is designating and requesting, are they qualified? Do they meet what 702 requires? And in the case of Rodriguez, in the case of Harris, once again, it's the district court's obligation to make some sort of determination. The harm for Mr. Goulet is most stark, because without Rodriguez, without Harris, there is no link to all of his other activity being associated with or on behalf of Cantaranes. Rodriguez interprets evidence that Goulet was doing certain things on behalf of the gang. Harris talks about how what was found in Goulet's home indicated he was selling drugs on behalf of the gang. So if you excise these so-called experts' testimony from the government's case, there is no link. There is no connection that anything Donald Goulet was doing was on behalf of the gang. Now, Mr. Enriquez didn't talk very specifically about Goulet, but he did link the type of things Cantaranes would do. And here is the other problem with him. He starts to say, well, I'm a Mexican mafia expert. I'm not a Cantaranes expert. And yet then he opines as to what typical Cantaranes would do, because they are under the umbrella of the Mexican mafia. And here is the problem. When you do not have this reliability determination by the district court, and when the expert's background is based on their experience, it becomes even more important that the district court take that step. Well, suppose if we agreed with you, would we remand for such a determination now? That would be the appropriate decision, Your Honor. Do you have any particular doubt how it would come out? I think that particularly with Rodriguez, who suffers the same problem as Enriquez, Rodriguez had no current information regarding Cantaranes, and yet testified and opined about what that gang did regularly at the time. Yet he admitted he had very little connection. I think it's most clear that Enriquez and Rodriguez would not be found to be appropriate experts in the fields that they were designated to discuss. Paris is a little different. Paris's problem is that he didn't have any specialized knowledge, so I believe that the court would also find a problem with him. Not that a DEA agent couldn't be the type of drug expert that Paris was, but that Paris wasn't qualified. He did not demonstrate specialized knowledge, which is the first question under 702. Is there something specific this person knows more than others? He was the average DEA agent. He had no other information that a normal DEA agent would have regarding drug trafficking. And in fact, as he testified, he was confused about what would be sellable amounts, how things were determined. He had no methodology. He couldn't even articulate how his particular experience led him to the conclusions he had. Phrases like, well, I use this amount of ten because it makes one-tenth of a gram because it makes the math easy. That is not the type of reliable method, the reliable procedure that experts in this field would use, and that's the problem. Okay, your time is up. And I didn't hear from Ms. Ivins, and I haven't heard from you, whether any of you are trying to reserve time. But you actually used your time, so thank you. Yes, Mr. Farmani, Your Honor. Yes. Yes, good morning, Mr. Farmani, Tony Farmani, on behalf of Mr. Huguera. But I'll be speaking on behalf of all the defendants, Your Honor. And building on what my court counsel just stated, in addition to Officer Rodriguez not having the experience, if you will, to be able to opine on the matters that he opined on, the jury instruction that was given to the jurors, in order for him to be able to make a distinction between his expert testimony, so-called expert testimony, versus the way it was completely defective, Your Honor, under the case law in this court and case law from other circuits as well. It just wasn't sufficient to guide the jurors with what they were tasked to do in this case, Your Honor. And the part about Rodriguez's testimony, Your Honor, that's also troubling, is that he basically had very, very little, any personal knowledge about what he was testifying to. And this goes into the 701, the lay opinion testimony. We know there is a personal knowledge direct participation requirement, and he had none. I mean, the whole case, the whole time that he's testifying, Your Honor, he's testifying based on his general participation in the investigation. He talks about a whole host of things that these people are doing, but we don't know where he's getting his facts. We know he had very limited experience. Well, is that a failure of the cross-examination? I mean, could you have asked for everything every time he said anything? How do you know that? I think they did do that, Your Honor. To some extent, they did object it in parts of the record what they said, and sometimes those objections were sustained, but more times they were overruled. One effective way would be through his cross-examination, Your Honor, but I think when he comes in, he's already designated as an expert. There is no jury instruction as to the differences between his expert testimony versus lay opinion testimony, and you also have a mixture of the two, Your Honor. You have a mixture of the two while he's testifying, so the answer to that question, Your Honor, would be I think it would be effective in a case where it would be one or two incidents where he's testifying based on his general knowledge of the investigation, but in this case, you have every aspect of this man's testimony comes from his general participation in the investigation. I mean, he had very little involvement in the investigation to begin with. He had very little experience with the gangs. He had zero experience with Brown Brotherhood, which is where Mr. Rivera is from, the gang that he is from, and he had very limited experience with Hunter-Ronas, Your Honor. He had 50 contacts with gang members. We don't know what the basis of those contacts are. We don't know if there were interrogations. We don't know if there were just simply building reviews. Are you talking about the lay testimony now? I'm talking about – well, basically, I'm talking about his expert testimony. He had very little information to begin with, and then his lay testimony, we have to see what it was based on, and the best we can do, because there was no hearing on the reliability, Your Honor, is to look to see where his information came from, and if we try to glean from the record where his information comes from, we know he had up to 50 contacts with Hunter-Ronas' gang members, and we know he had up to maybe 10 contacts with Brown Brotherhood, but he also says that he was never designated as an expert in Brown Brotherhood. He's never spoken to Mr. Rivera or any other gang member. I'm having a hard time because you're moving around. I thought your main focus was on the fact that the lay testimony was affected by the expert testimony, so we're trying to focus on the lay testimony. Is that not right? We're focusing on lay testimony to the extent that his testimony was not based on personal knowledge. Right, okay, so he says he had 50 contacts in this investigation. Is that it? No, Your Honor. Generally speaking, the time that he was a police officer – Right, but that's not relevant to the lay testimony, right? The lay testimony has to be based on his percipient – well, I suppose it could be relevant, but it's his percipient knowledge. And then a lot of times he said it's based on participation in the investigation, and it appears – and sometimes he says, you know, when I talk to other officers and so on, so it appears that a good deal of it may have come from hearsay, but I haven't gotten – you haven't really pulled those pieces out very well. Your Honor, I can tell you that if you'd like for me to go through them, we did cite them in the opening brief, the portions where the government is saying, based on your participation in the investigation, what about this? What about that? And we have cited to the record, but I also have them here with me if the court would like for me to go through them one by one. But again, that's where you come up with the cross-examination problem. Could you have said, okay, why? I mean, you could have, right? You could have said, well, tell me what about your participation led you to think X? Can you give me any examples where you did that? I can't give you examples that they actually went and asked him what the basis of his information was. Yes, Your Honor, I can't do that. It's not part of the record. They did object a few times, and he was sustained, but they objected additional times, and it was overruled. Counsel, why doesn't your argument go to weight rather than admissibility, specifically on the dual role question? It would be a lot harder for defense counsel if the government sort of weaved back and forth. But I thought in this case, the government had, at the court's instruction, tried to clearly designate with Officer Rodriguez when he's testifying in his capacity as a percipient witness and when he's testifying in his capacity as an expert. So with the kind of signaling questions, then it becomes pretty clear that, okay, you're testifying on these incidents as percipient, and now you're testifying as opinion. So that's why I thought it would be pretty easy for defense counsel to then challenge that. Doesn't that all go to weight rather than admissibility at that point? Your Honor, that would be correct if, in fact, the jury had the appropriate tools to make that distinction. So when the government is claiming that we're now going into expert testimony or percipient testimony, there is no jury instruction that follows or beforehand that would guide the jurors in making that distinction. I thought he did give that instruction twice, both at the beginning and later. Well, he does give one instruction, Your Honor, but it's not consistent with what the case law in this circuit requires, the actual differences between the two, between the two testimonies and what the jury is supposed to do with one versus the other. And there was no clarification. I mean, the jury instruction the court gave at the very beginning of his testimony, it was just a stock jury instruction, which was one paragraph long, Your Honor. The court has it as part of the record, and it was not what the court requires in these type of settings to be given. I thought the district court, in between the two different phases, okay, now the expert testimony ends. Now we're going to start the percipient testimony part of it, but the district court instructed the jury again to keep in mind the difference between expert testimony and percipient witness testimony. That is incorrect, Your Honor. The court actually instructed the jury only once at the beginning of his testimony, and it began with the expert portion of his testimony. Then he went into the lay opinion testimony without the court giving any type of instructions, and when he did go into that, he's relying, clearly he's relying on hearsay statements because virtually every single piece of his testimony is preceded by based on his participation in the investigation. I mean, in Gadsden even, Your Honor, where this rule was broadly applied, you had direct knowledge. The agent had participated in the investigation extensively. In this case, we don't know what his participation was. What we do know is that from what we have from the record when they're trying to bring him as an expert, or his participation, if you will, in this investigation is very limited to probably three or four instances where including the arrest after Mr. Ruggiero was arrested coming in to confiscate the evidence that was taken from him. That was it, and he's got some surveillance experience that he was involved in, but we don't know what the basis of his underlying testimony is. Mr. Farmani, may I interrupt you for a second? Absolutely, Your Honor. When the question is asked of the witness if he's relying on his participation, was there an objection by defense counsel that the question was vague and ambiguous and didn't go to the factual basis of his actions? No, Your Honor, there was not. I didn't think so. Okay, well, your time is up. I want to tell all the defense counsel that I will give you, say, two minutes to rebuttal collectively and at some point you should decide who's going to take it. All right? That's the problem with split arguments. Ms. Ivins. Good morning. My question hopefully is more concise and simple than the two that went before me. Ms. Ivins, just a minute. You're totally frozen. We can hear you, but now you're gone. Okay. I'm clicking the correct link. Am I better now? I think so. Kind of strange. Okay, I'll move? Yeah, move. Okay. All right. So to violate VICAR, the violent crimes part of RICO, there are two assault provisions. One is assault with a dangerous weapon, and one is assault resulting in serious bodily injury. And obviously you can attempt or conspire to do those and violate VICAR. But that is not how Mr. Olguin was charged, and that is not how the jury was instructed. They instead relied on the language in the California Penal Code section, which was to attempt to assault by means of force likely to cause great bodily injury. And so we have an attempt. I have a naive question. An assault, as you say, is by its nature an attempt. So how can an assault ever be likely to cause great bodily injury itself? I mean, it can be an attempt to cause great bodily injury, but if you don't have to actually do it, how could it be likely to cause great bodily injury? I mean, that's a great question, Your Honor. I mean, that is how the California Code 245A is divided into pieces, and they disaggregated the deadly weapon part from the likely to cause great bodily injury part. They used to be together. And so I assume that it's without a dangerous weapon, right, some way that you are going to injure someone attempting a battery. The battery of which would be likely to cause great bodily injury. I mean, California is very clean on that in terms of like, you know, an assault is an attempted battery basically under California law, and it's not that way in other states. So you can have attempted assaults in other states. So here basically what happened is by using the California formulation, the government removed it one step from what VICAR requires, and therefore the jury, because this evidence was aggressively controverted, because Lieutenant Arradondo said it was just a fist fight, it was a scuffle. We had, I think, one of the nurses saying she was ready with her pepper spray. The person attacked, you know, had no injuries. He walked away. And certainly, you know, they watched the videos over and over, and defense counsel is very on this. I don't think we can say that it wasn't prejudicial to Mr. Olguin, that there was this mistake in the jury instructions, and that the instruction really isn't a VICAR offense, because the VICAR offense is pretty clearly more serious than an attempted assault, even if such a thing were a crime under the California statute. First superseding indictment did reference the correct California statutory code for 245, right? It specifically said penal code section 245 is the predicate offense that the government's relying on. Yes, 245A4, which has a different linguistic formulation than VICAR A6, or even the attempt, the assault statute, the federal assault statute, 113A6. The formulation of the type of directness of the harm is different, right? The VICAR language is assault resulting in serious bodily injury, and the California penal code is assault by means of force likely to cause great bodily injury. And so attempting something that's likely to cause is a step removed from attempting to impose something that results in great bodily injury. And we're reviewing this issue for plain error? Yes. Yes, Your Honor. And he raised it both, we raised it both as the jury instruction error and as deficiency of that evidence to show VICAR. And this argument is separate from the argument, which I don't find very persuasive, that the change in the California statute meant that you had to have a weapon for this violation. In other words, the whole issue about the cane is irrelevant as to this point. Correct, Your Honor. The point in the brief I tried to make was that now that California has divided it, assault with a deadly weapon, which could be the cane, was not what was charged. It was charged as assault likely to result in great bodily injury. And so there's an argument in there very briefly that you can't really consider the cane even if we feel that they proved it. But we don't need to consider the cane for your other argument to succeed. It just doesn't matter. Right. Yes, Your Honor, that's correct. Okay. Is there anything else you're going to argue? No, Your Honor. I think the other arguments are extensively covered in the briefing, and I'll save these for the moment. Well, I am somewhat interested in it. I mean, I gather you're making a sufficiency of the evidence issue with regard to your client. I mean, you spent a lot of time talking about how there's not too much. It's sort of like the Mendoza case. There's not that much evidence that he actually did anything specific. But in this case, and this is why I kept asking the issue in the other case, it seems to be understood that the individual defendants did not have to be involved in drug dealing. You're not arguing that your client had to be involved in drug dealing to be guilty of the RICO conspiracy, right? You're focusing on the 50 grams but not on whether he had to actually be involved in drug dealing. Your Honor, you have to be engaged in doing acts on behalf of the RICO enterprise, or you have to agree with someone that they're going to do those acts on behalf of the enterprise. And in this case, the really critical thing for him was the finding of the drug amount, right? Not just the being guilty of the RICO conspiracy, but the finding of the 50 grams worth of methamphetamine. Did you spend so much time on this hookup question? Because the government wants to have an argument that he was, you know, on behalf of the enterprise in order to hold him liable for the 50 grams or more that is why he is doing such a severe sentence in this case, even though the jury acquitted him of actual drug trafficking. And so there is no evidence that he personally was involved with anyone in the gang in dealing drugs other than the hookup language that the experts testified meant drugs, even though there was a lot of, you know. And the MESA language, which was interpreted by Enriquez in this very specific way as meaning that he had to be selling or collecting on drugs, which is. Right. And then there was the evidence in the letter about the MESA, that he set up the MESA at Chino. But as I pointed out in the brief, the MESA could be dealing in, you know, contraband cell phones or could be dealing in anything else. It didn't have to be drugs. And there's no evidence that during the time he was at Chino, any of the inmates were dealing drugs. So, I mean, that's an interesting fact, but it's not proof beyond a reasonable doubt that he was actually selling drugs on behalf of the gang for the months that he was at Chino. So that's why it was important is because it's what caused his sentence to be so severe. Ms. Ivins, may I ask you a question? Yes, Your Honor. With respect to the indictment which indicted for attempted to commit assault, which you quite correctly point out is not a California crime, an attempt to assault, is it your claim at all that this was a constructive variance of the indictment that he was indicted on attempt to assault and he was convicted on No, Your Honor, because I think that what actually happened is he was indicted on attempt to assault and he was convicted of attempt to assault, which is not a Vicar crime. But on the other hand, we have this video which shows him actually assaulting somebody. Right. Or actually a battery, an actual battery, but he wasn't charged with an attempt to commit a battery. He was convicted under 245A4, which is a completed assault. Correct. And the requirement for Vicar is more than simple battery and more than simple assault because it has to be resulting in serious bodily injury. So yes, he's guilty of that crime. He just is not guilty of a Vicar crime. Okay. Definitely jumped in and hit him. There's no question that he did that. But Vicar is a higher level and the language of Vicar is more onerous than the language in the California Penal Code section. Okay. Got you. Okay. Your time is up as well. We will now hear from the United States, Ms. Degreva, who has a lot to do. Thank you. Good morning, Your Honor. Victoria Dictadova on behalf of the United States, and may it please the Court. So I'd like to begin with the issue of Officer Rodriguez's testimony, specifically the dual role instruction and his lay testimony. You know, I understand we've said this is permissible. I do not understand why it is permissible to have a – because it's more on the expert side that I have a problem. That somebody who is directly involved in the investigation is inevitably going to mix up the investigation and his supposed expertise. He has no objectivity because he is directly involved – he was directly involved in trying to arrest and convict this person. And that seems inconsistent with what an expert is. It's supposed to be somebody with some objectivity and separation from the situation. Now, I understand that that's not where we are in the case law, but doesn't that at least suggest that we have to be very careful about allowing both pieces of – kinds of testimony by somebody who is wearing two – essentially has a conflict of interest in terms of what he's supposed to be doing? Your Honor, for those reasons, in this case, both the Court and the government were very careful in how the testimony was introduced and in making clear the distinction between the two and in separating the testimonies. So first, the District Court did instruct the jury twice. First, immediately before Officer Rodriguez testified, the District Court provided a dual role instruction. At the end of the case, it provided a more fulsome dual role instruction. And actually, in the middle, when Officer Rodriguez switched from his expert testimony to his recipient testimony, the Court reminded the jury that it had already explained the difference between expert testimony and recipient testimony. The government also made clear when it was beginning the expert testimony, when it was ending the expert testimony and beginning the lay testimony, and then at the very end of the direct examination that it was once again returning to the expert testimony for a couple of questions. Additionally, when Officer Rodriguez was testifying as a lay witness, the record is clear that he was testifying as to things that he personally saw, did, heard. Well, I don't think he heard. That's right. So he was testifying on the basis of hearsay, a lot. But we don't know how much. Hearsay from gang members and hearsay from other officers. I do not believe he was testifying to hearsay from other officers. He said that. At least at one point he said it. He said, I've talked to people about this case, and that's how I know things. He said that he spoke to other officers when he was laying the basis for his expertise, so when he was explaining his qualifications to testify as an expert in this case. And that's at page, I believe, 713 of Volume 4 of the Excerpts of Records. But the defendants have not identified any specific lay testimony that was based on hearsay. And to the contrary, the vast majority of the lay testimony was about things he personally did. So, for example, he testified about personally participating in the search warrant at the Holguin residence, participating in the traffic stop of Holguin and his brother, participating in the arrest of Higuera, surveillance he conducted of a gang meeting, prior interactions he personally had with the defendant. When he was then testifying about roles of various individuals, he once again made clear that he was testifying based on conducting surveillance personally on David Gaitan previously, having observed Ian Casillas previously, having seen Monica Rodriguez previously through search warrants and parole and probation searches at her residence, having seen Peter Orozco previously. So in all of these instances, in many instances, he specifically explained that he had personal prior interactions with the people about whom he was testifying. And indeed, in the few instances where, as a lay witness, his testimony veered into hearsay, the court sustained objection. So, for example, at page 819 through 820 of Volume 4 of the Excerpts of Record, the court sustained a hearsay objection to testimony that someone else had told Officer Rodriguez that mail was seized at Pelican Bay. At pages 845 through 846 of Volume 4 of the Excerpts of Record, the court sustained a hearsay objection and an objection to lack of foundation for testimony regarding how David Gaitan was associated with a particular residence and made Officer Rodriguez lay the proper foundation, at which point Rodriguez testified that he had personally conducted surveillance at that residence previously and was basing his testimony on those observations. On this record, the District Court had ample grounds to conclude that Officer Rodriguez, when he was testifying as a lay witness, was testifying properly as a precipient witness based on things that he personally had seen or did and not based on hearsay. And again, the defendants have not identified any specific lay testimony that was actually based on hearsay. They only point to that one instance on page 713, which is the basis of his expert testimony. So in that regard, this case is similar to United States v. Gadsden. And in fact, I believe there's even more evidence here than in Gadsden that would have allowed the District Court in admitting this lay testimony because Officer Rodriguez had the requisite personal experience and specifically testified that he was basing lay testimony on prior surveillance, search warrants, other such things he participated in. This is not a case, as Defense Counsel has suggested, where Officer Rodriguez had no involvement in the investigation. He personally had a huge amount of involvement in the investigation as one of the lead case agents. And in addition to his involvement in the investigation, he also testified that in his work with the Whittier Police Department doing gang investigations more generally, he had come into contact with various people who ended up being arrested in this case. He testified that he had participated in other search warrants that did not involve these defendants. And I believe at one point he testified that during the time that he was working on these gang investigations, the Contarana's gang members were under the microscope by him and his partner, which is at page 963 of Volume 5 of the excerpts of records, and that he was involved in gang suppression, which involved driving around the neighborhood, looking for what he believed to be possibly gang members, making contact with them, and maintaining high visibility within the gang area. So there was ample evidence in the record that his late recipient testimony was based on those personal experiences and not based on hearsay. Can you address opposing counsel's argument regarding the district court's lack of an explicit finding of reliability, particularly as it goes to Enriquez's testimony and his proffer as an expert by the government? Yes, Your Honor. So beginning first with the sort of procedural aspect of whether the district court properly performed its function, the government submits that the district court did. The law is clear that the district court did not have to hold a dobber hearing specifically in order to perform its gatekeeping responsibilities. It could rely on the briefing and evidence submitted by the party and the testimony at trial. That may be so, but the case law suggests that an explicit reliability finding has to be made both in our circuit and other circuits as well. There wasn't one done in this case. Your Honor, I believe the case law, for example, Valencia Lopez, suggests that a reliability determination must be apparent from the record. And in this case, that reliability determination is apparent from the record because the district court had before it an ample briefing on four separate motions. It then actually requested supplemental briefing specifically on the issue of whether it needed to hold a dobber hearing. In denying the dobber hearing, it stated in its order denying the hearing that it had reviewed the party's briefings. It had before it the government's expert disclosures, the resumes of the witnesses. The witnesses provided foundational testimony and direct examination. And having all of that information before it, the district court denied the defendant's motions and admitted the expert testimony. So I believe on that record, it is apparent that the district court, having had the benefit of the party's briefing on relevance and reliability, and having heard the foundational testimony, by denying those motions and admitting the testimony, the reliability determination is apparent from the record. I just don't see support for the reliability finding being apparent on the record in the case law. You're citing to Valencia Lopez, which says that the court abandons its gatekeeping role when it makes no reliability findings. And then Ruba Caba Garcia says an implicit finding of reliability is not sufficient. So I think we're in the land of harmless error review as it comes to this issue. Can you address Enriquez and counsel's point that his information is really aged, which then creates problems in terms of reliability? Yes, Your Honor. Under harmless error review, any error here would have been harmless because the defendants have not presented any evidence to undermine the qualifications or the reliability of the witnesses. So looking first at Enriquez, as Your Honor has asked, he explained that not only did he have approximately 20 years of experience as a Mexican Mafia member, since he left the Mexican Mafia member, he had spent approximately 17 years working with law enforcement on investigations relating to the Mexican Mafia. In that capacity, he had listened to thousands of intercepted calls, read thousands of prison correspondence letters. And then he was allowed to testify that not just that Mesa meant that they were going to support or forward the gang while in prison, but this very specific testimony about it, something about it meant that they were going to, you know, sell the drugs for a certain amount and give a certain amount to the Mexican Mafia leader and so on. And, I mean, that degree of specificity, one would think he needs to have some expertise of current behavior of this particular gang and some way of knowing that this very specific language, that this very specific definition was what was meant by this. How do those things connect up? His expertise is in relation to the Mexican Mafia and he has current expertise in relation to the Mexican Mafia because in addition to what I mentioned... So I don't have the exact definition he gave before me, but it struck me as being exceedingly specific such that some information from 20 years ago wasn't going to do it. I believe he referred to the Mesa as an ad hoc commission of Mexican Mafia associates who control the legal activities in prison on behalf of the Mexican Mafia. Yes, that was one point, but another point, he was much more specific about what it meant. Yes, Your Honor, and that is not based solely on his experience as a Mexican Mafia member 20 years ago. It was also based on his participation in Mexican Mafia investigations, much like a law enforcement officer who is testifying as an expert would not have had personal experience as a Mexican Mafia member, but is basing that testimony on experience through participation in investigations. Additionally, Rene Enriquez, who was still incarcerated at the time of this trial, testified that he had a lot of contact with Mexican Mafia associates who had left the organization much more recently and who were with him in the place where he was housed, and so he would speak to those individuals and get information from them on the current activities of the Mexican Mafia. But there seems to be an equivalence that you're telling us about evidence of an undercover agent with the... And you keep saying Mexican Mafia, and I take it that you think that Cantarranas is just a subsidiary of the Mexican Mafia. We'll put that to one side. But there's a difference between experience as an undercover agent with the Mexican Mafia or the Cantarranas and participating in investigations of the Cantarranas where his information may be coming not from the members of the mob, but from other police people talking to him. So was there enough evidence in this case that Enriquez, 20 years ago, had enough contact with the Cantarranas so that his experience qualified him as an expert witness? I'm sorry, Your Honor. I was not equating his experience with specifically an undercover officer, but simply a law enforcement officer, not in an undercover capacity, but a law enforcement officer who participates in investigations, for example, by listening to intercepted phone calls, by reading letters, by speaking to people who drop out of a gang or the Mexican Mafia. And such witnesses are routinely admitted as expert witnesses on gangs or the Mexican Mafia. Now, Rene Enriquez, in addition to having that experience of participating in investigations and speaking to other dropouts, including those who left the Mexican Mafia more recently, he has, in addition to all of that experience, has the added benefit of having been in the organization himself. So all of that combined, I believe, is more than sufficient to render him qualified to be an expert on the Mexican Mafia. Are you equating the Mexican Mafia with Cantarranas? Cantarranas is a gang that is loyal to the Mexican Mafia and specifically to Mexican Mafia member David Gavaldon. And in fact, Rene Enriquez testified that he actually knew David Gavaldon, that they had been made Mexican Mafia members together around the same time in the same prison. So he had ample experience with that specific Mexican Mafia member that the Cantarranas gang owes their loyalty to. Now, with regard to the Mesa testimony specifically, with regard to that letter, testimony and expertise about the Mexican Mafia is very relevant because Enriquez, in that letter, was writing to David Gavaldon, the Mexican Mafia member. He was in prison, and he was acting in prison on behalf of and for the benefit of the Mexican Mafia member. So in that regard, his activities were very closely tied to the Mexican Mafia, and Rene Enriquez, as an expert on the Mexican Mafia, would have been qualified and his opinion would be reliable to testify as to his interpretation of that letter. Moreover, when he was interpreting the letter, he was very specific in explaining the basis for his interpretation. So he explained that, generally, when he interprets coded language in letters, he looks for a break in the fluidity, or something that seems out of context in the conversation. And in the case of the letter related to the Mesa, he testified that he believed the reference to Chino in that letter was actually a reference to being in Chino State Prison because of other words that surrounded the reference, such as a reference to East Chino, which is a portion of the state prison, a reference to roommate, which is a term commonly used for cellmate, a reference to the ranch. There was also a reference to Palm Springs, which Rene Enriquez testified he knew to be a common term for Palm Hall, which is a portion of Chino State Prison where Mexican Mafia members are housed, and which at one point was sort of the de facto headquarters of the Mexican Mafia. So in providing his testimony regarding that specific letter, he explained the basis for his opinion that this was a reference to activities in state prison. And in fact, that testimony was actually corroborated by CDCR records of Enrique Joaquin. In the letter, Enrique Joaquin said that he had spent the past six months in Chino, and CDCR records show that for the six months prior to that letter, Enrique Joaquin was in fact incarcerated in the Chino State Prison. If you're getting ready to move to another issue, can I have you address the 245 that's charged in the Vicar count and also specifically the jury instructions that the district court gave, which frankly this issue is confusing to me, because the district court gave the set of instructions that correspond to attempted assault, which is not a crime in California. Yes, Your Honor. The indictment in this case tracks the federal Vicar statute, and the Vicar statute criminalizes an attempt to commit a crime of violence in violation of the laws of any state. Now, subsection six of the statute specifically states the penalty for attempting to commit a crime involving assault resulting in serious bodily injury. So actually, the Vicar statute itself supplies the attempt element of the crime. In other words, by Vicar's plain terms, defendant Holguin… That's not the part that confuses me, because as I asked Ms. Ivins, and she agreed, it was charged appropriately. I think there's specific reference to the PC 245 charge, and I understand what the government was trying to do in trying to track the language of the Vicar statute. When it comes to the instructions, though, that's the part that went a bit awry for me. Is there any specific portion of the instructions that Your Honor would like me to focus on? Well, the district court instructed on attempt, right, which is contrary to the CALCRIN, the standard jury instructions, which says attempted assault is really not a crime under California law. So the district court… Basically, the district court gave the attempt instruction and then instructed on aiding and abetting theory. Yes, Your Honor. Under California law, and I believe this is California Penal Code Section 240, assault is actually defined as an unlawful attempt. So assault under California law encompasses the idea of attempt, and instructing on attempt was not erroneous. The district court instructed, and this is on pages 27, 38 through 39 of Volume 11 of the Excerpts of Record, that Holguin, in order to be guilty of this crime, Holguin had to have committed an act that, by its very nature, would directly and probably result in the application of force to a person, and that the force used was likely to produce serious bodily injury. And that is exactly consistent with the elements of assault under California law, as stated in People v. Aguilar, which is a California Supreme Court case at 16 CAL 41023, in which the California Supreme Court held that in order to be guilty of assault under California law, there must be proof that as a result of physical force used or attempted to be used, there was a likelihood of great bodily injury being inflicted upon another person. So there was no confusion here as to what Holguin was charged with. He was charged with attempting to inflict force on the victim, and that the force was such that it was likely to produce serious bodily injury. And that is also exactly what was proven at trial. There was sufficient evidence that Holguin attempted to use physical force that would have been likely to result in serious bodily injury. So there was also, even if there were any error in the instructions, there was no prejudice here because of the lack of confusion and the ample evidence showing that Holguin, in fact, did violate the California assault statute. And I could go over that evidence if that would be helpful to Your Honor. No, I think the evidence is there. It's just the way that the court instructed was confusing to me. Because if you go to the CALCRM 785, which is the model instruction for the State 245 count, it specifically says in the notes, do not give an attempt instruction because there is no attempted assault in California. It's not a crime. And so where the district court, and I think the government, in submitting the proposed instructions before it went awry is you didn't dig down to the state predicate statute to see how it should have been instructed. Yes, Your Honor. However, under VICAR, there is an attempt. And because this was charged as a violation of the VICAR statute, I believe giving that attempt instruction was not plain error as it was not objected to before the district court. I'm somewhat confused. I don't believe it would have caused any confusion to the jury on what exactly was being charged and what the government's theory was or what the evidence showed. Maybe it's a question of really dotting the i's and crossing the t's rather than whether there's any plain error here. I think it would be beneficial in these types of cases for the court to very clearly identify the predicate offense to say this is the predicate offense that the government's relying on and that's what's charged in the indictment. I think the indictment was probably correct, but what the district court identified as the predicate offense is the crime of attempted assault. Your Honor, and again, if... It would surprise me if anybody dug into this issue as part of the argument. I don't think that that really was on anybody's consciousness from what I see from the transcript, so maybe the jury just likely treated it as a non-issue. Your Honor, again, even if there were error, assault under California law is an unlawful attempt, so even though the terminology is a little different, the substance is the same. Whether under federal law you say attempted assault or under California law you say just assault, which encompasses an unlawful attempt, the substance is the same and the defense cannot show any prejudice from any potential error here. Now, I believe that during the defense argument there was also brought up the issue of the sufficiency of the evidence with relation to Holguin being involved in drug trafficking, and if Your Honors would like, I can go into that, even though it was not one of the issues. I can address that. So because Holguin was convicted of the Rico conspiracy, there's no requirement that he personally be involved in selling drugs in order to... This is what I was confused about in the other case, because in the other case we were told that there was such a requirement, at least the way the case was argued, but you're saying this case wasn't argued that way? Well, in the other case, the defendant was convicted of a drug trafficking conspiracy. No, but there was also a Rico conspiracy. Yes, Your Honor. Here, defendant Holguin was only convicted of the Rico conspiracy. I mean, I do think you're telling us in the two cases two different things, but I guess you guys can sort that out. Because in the other case, the government's accepting the proposition that he did have, for the Rico conspiracy, had to himself have been engaged in drug trafficking, and in this case you're telling me he didn't. Your Honor, I think the facts are also very different in that in this case there was evidence that Holguin was engaged in the Rico conspiracy in other ways, not only through his involvement with drugs. So, for example, he committed violence on behalf of the Rico conspiracy when he committed an assault against another inmate that he believed was in protective custody and was no good. So there can be, as long as Holguin was joined in agreement to further the ends of the Rico conspiracy, he could do so either by selling drugs, committing violence. Okay, I understand that. My understanding of the point that Ms. Ivins was making is that for that reason she is not contesting the Rico conspiracy as such. What she is contesting is the 50 grams, which is drugs, and which she says that he isn't connected to. Your Honor, in order to be connected to that 50-gram finding, specifically for the sentencing, there has to be evidence not specifically that he sold 50 grams himself, but that the 50 grams was part of the joint criminal activity, that it was reasonably foreseeable to the defendant, and that it was within the scope of his agreement. And the evidence here shows that all of that is true. So, I mean, I will tell you that I was quite disturbed by this whole hookup testimony, because it does seem to me that there was nothing connecting that letter to any drug trafficking. But I gather you're telling me it doesn't make a difference. Yes, Your Honor. And with relation to the hookup testimony, it wasn't just the phrase hookup. There was also the fact that it was hookup from Boxer's ER. Yes, but if you think it makes a difference, we can get into it. I understood the argument you were making before. That doesn't matter. Your Honor, that's right. It doesn't matter. There was ample other evidence, even if you take out the hookup testimony. And indeed, if you look at the closing argument, the prosecution spent very little time discussing that hookup evidence because it was such a minor part of the evidence against Enrique Jolín, which included, vitally, letters to the leader of the Contrabandes organization. It included drugs that were seized from his home and from a car that he and his brother were driving. It included violence that he committed on behalf of the organization, as well as his own statement explaining why he committed that violence, because the individual was no good and in PC. So with all of that evidence— Excuse me. It means protective custody. And there was testimony that individuals who are in protective custody are viewed as people who have violated the rules of the organization, and those individuals are expected to be assaulted or even murdered. Okay. Your time is up. Is there anything else you're anxious to tell us? No, Your Honor. Thank you. All right. We will give one of the defense lawyers two minutes to rebuttal. Thank you, Your Honor. I will take the rebuttal. David Colony, this is for Donald Goulet again. Your Honor, two very quick points. First, the court, the district court, has to make the reliability determination. We are not arguing that it has to be a daughter hearing, but there has to be some procedure. And as the case authority in this circuit has said very clearly, when that expert, when that 702 opinion testimony is based on experience, it is even more important that there is this reliability determination because there's not the objective tests that science would allow or medicine. And that's what the problem is. Well, of course the problem is that because there is no objective test, it's not clear there is any test. It's completely amorphous. And as a result of being completely amorphous, it's not entirely clear what the reliability analysis accomplishes. Well, actually— I mean, here we have—both of the people that you're—or all three of them certainly had a lot of experience with regard to something or other that's relevant here. If they start testifying outside of what it is that they seem to have had a lot of experience about, then you could object to that. And I understand that they're supposed to have methods and procedures, but honestly it's just a front because there really aren't any methods and procedures that an officer applies other than his aggregated memory and the kinds of judgments he reaches as a result of his aggregated experience. I mean, there really isn't a methodology. And that's what's wrong with it, but it means that the reliability determination is not going to accomplish very much. Well, Your Honor, I only have a few more seconds if I may answer the question. Yes, please do. That's what 702 lays out. A methodology has to be consistent with what that experience is. It has to be more than an officer's gut. So at points you seem to be arguing that it wouldn't be a bad idea or it would be a good idea and consistent with the rule, it seems to me, but it isn't how we've been doing it, that it isn't good enough for him to just say, you know, I did a lot of this and I remember it. He has to have some presented methodology in which he aggregated his memories and his experiences and can plug particular situations through it. But we've never insisted on that. Well, and that's the problem, and that's why we have this issue where it's very difficult to understand what the district judge here was actually doing when he says during the hearing, you know, it's a motion in limine, so evidentiary rulings are tentative anyway, so we're going to see how the evidence comes in and then we'll decide. That's backwards. We have to have that determination first to make sure that what gets in front of this jury is reliable, and then on cross-examination what we do is we attack whether or not the conclusion is actually reliable. But it has to have—I'm sorry, Your Honor. Your time is up. Thank you very much. Thank you very much. Thank all of you for your help in this very complicated and difficult case. We're going to take a 10-minute break. Meanwhile, the case of United States v. Hogan, Higuera, and Goulet is submitted. Thank you very much.
judges: BERZON, BEA, NGUYEN